Delivery Association v. Mara T. Healey Good morning. Douglas Martland, Assistant Attorney General for the Commonwealth and the Attorney General defending Healey. Cutting right to the chase, I acknowledge that this panel is bound by Schwann. However, the Attorney General respectfully maintains that Schwann was wrongly decided because speculative potential effects should never be enough to trigger F-Quad A preemption of a worker classification statute, particularly when the summary judgment standard is correctly applied and all inferences are drawn in favor of the anomaly. It seems to me, counsel, that you started off with an inconsistency, right? We are bound by Schwann, right? That makes it immaterial whether or not Schwann was correctly decided or wrongly decided. We have to accept Schwann and apply Schwann. So the question of the wisdom of the Schwann decision or its correctness isn't before us. The only thing that's before us, or at least the first thing that's before us, is what is to me the obvious question. Why doesn't Schwann dispose of this appeal? As I said at the outset, Your Honor, we acknowledge that this panel is bound by Schwann. All right. But why doesn't Schwann? It appears to me, reading Schwann, reading your brief, reading the record, that Schwann decides, essentially decides, the issue that you've asked us in this appeal to decide. And I acknowledge that it holds that prong, too, as preempted by the FQA. We have developed our case on a more significant record here. Oh, I understand that. I understand that. But your case, the contours of your case are essentially the same as the contours of the case in Schwann. And maybe the Commonwealth would have made out better had the record in Schwann been developed the way it was here. That's not the case. I acknowledge that, that there are substantial similarities. One difference is that in FedEx the issue is concerned with first and last mile delivery. Here we are concerned with same-day delivery. So there are distinctions between the two cases addressed in our reply brief, also in relation to the status of the independent contractors. But I do understand the force of your question and acknowledge it. However, we do have concerns related to the standards applied and the burden of proof set forth in Schwann that we would like to address for how FQA preemption applies in this circuit moving forward. Maybe you had best start with what you think the differences in the two cases are and why those matter. We, having litigated this issue a number of times, are fully aware of the state's reservations about the direction this court's decisions have gone. Maybe you'll go to the Supreme Court. Maybe you'll convince them there's a circuit split. But for now, don't waste your time on stuff like that, okay? Certainly, Your Honor. And as you well know, I presume, this issue is currently pending on a cert petition from the Seventh Circuit's decision in Vivec. But we think the Seventh Circuit is distinguishable from our situation and we'd probably emerge with no reason to change our law. So why do you think this is different? As I was explaining, Your Honor, there are several distinguishing factors here. The first is that FedEx concerned a case about first and last mile delivery and whether or not the independent contractor was preempted in that case. And why does that make a difference? The difference here – well, the difference in FedEx was that the independent contractors, which were both individual drivers and also – No, no, no. But you said first and last mile delivery. Why is that different than the same day courier service that we're concerned with? It seems to me that's kind of a component of it. Ultimately, they're different industries that aren't directly competing. The exemplar company in this case provided two types of delivery. One was scheduled route services and the other was on-demand services. Both types of deliveries occurred during the same day over a set period of hours compared to FedEx, which provides a much broader logistic system for delivery. But by definition, if the services provided in FedEx were much broader, including but broader than the services at issue here, I don't see how that helps you on the preemption argument. Your Honor, ultimately one of the factors that the Schwann decision focuses on is the amount of ownership that the individual independent contractors or the legitimate independent contractors, the businesses in Schwann, had over their routes. They had ownership. There was less direction and control compared to here, where there is no ownership in the driver's bid on the routes that they're attempting to obtain. So there are distinguishing factors between the type of industries that are at issue. But follow the thought through. I understand that there's a difference between owning a route and bidding on a route, but how does that militate in favor of a different result on the preemption argument? Again, Your Honor, I acknowledge that the panel is bound by Schwann in the force of your question. It is a difficult task for us today to distinguish the two cases. Yeah, but you've got to distinguish it in some meaningful way. I mean, we understand there are some factual differences, but what you're faced with is the prospect of having this panel write, in its simplest form, a decision that says the judgment of the district court is affirmed on the basis of the panel decision in Schwann versus the Federal Express, a decision that is binding on this panel, period. And so it seems to me the purpose of this argument is you've got to give us a basis, a meaningful basis on which we can say Schwann doesn't apply or shouldn't be applied to this case. And the other meaningful basis here, Your Honor, is that MDA failed to satisfy its burden of proof. And so when you look at the summary judgment record, they failed to show that Expressman's prices, routes, or services were significantly impacted by prong two. And that's not directly answering your question, I understand, but it does show that there are distinguishing factors between the two cases. You know, in the end, the state has to concede that applying this to MDA will increase costs to MDA and that MDA will find some way of passing those costs on and that, as the district court found, in doing so it may well affect the services it provides. It seems to me the state's case amounts to the test can't be whether it simply increases costs. Every decent treatment of employees increases costs. But you seem to draw a line for impact and significance that is very different from what we think Congress meant when it set up this preemption clause. So what do you mean by significance? We have three responses to that, Your Honor. The first, and this relates to one of our concerns about Schwann, is that potential speculative effects that could occur in the future are not sufficient to establish a significant impact. So the underlying premise of MDA 1, that there's a certain logic, an economic logic to running businesses that needs to be taken into account in looking at this, you're saying that that MDA 1 was simply wrong. Just as a point of nomenclature, I would refer to that as MDA 2. We're not saying that MDA 2 was wrong. MDA 2 remanded the matter to the district court for a full consideration of the evidence. Our concern is with the language in Schwann relating to the potential impacts or the impacts that could happen, and we view that as too speculative. In our view, for a potential effect to be significant, it should be sufficiently certain to occur that a court can treat it as established without the need for evidence and without affording the opposing party an opportunity to present evidence to the contrary. What we don't want is carrier say-so about economic logic being sufficient to trigger a preemption. Here, of course, the district court made factual findings without the benefit of Schwann, right? Yes. All right. So what's wrong? Put Schwann to the side. What's wrong with those factual findings? Ultimately here, the district court made two errors in relation to the conclusions about prices. The first is that prices are not the equivalent of an increase in labor costs. For an increase in labor costs to arise to a significant impact on prices or services, that impact, as the Supreme Court's ERISA case has explained, must be acute. And here the impact was not acute. Second, even if this court is willing to say or does say that prices and labor costs are equivalent, the labor costs that were asserted here are so significantly exaggerated that when this court delves into them, they'll find that the impact is much less than MDA claims. For example, Your Honor, I point the court to the claims regarding Social Security, Medicaid, federal unemployment taxes. MDA asserts that those account for 40 percent of the increase, along with the workers' compensation in the Massachusetts 62B, that those account for 40 percent of the claimed increases in labor costs. However, none of those are triggered by Section 148B or Prompt 2. The difficulty is employers' employees need some certainty. There is a great deal of uncertainty, which your briefs further, as to what is carried with the definition of employee, which state statutes apply, which don't. And maybe in 10 years you'll get an SJC decision. Maybe you won't. And in the meantime, the employer has gone broke by attempting to comply with what it understands the law to be. Part of the preemption notion is not to put those types of burdens on carriers in this multistate business. I certainly understand that concern, Your Honor. However, I point you to two SJC cases. The first is the Sebago case, which definitively resolves the questions of which statutes apply here. And it is clear that Prompt 2, if it were to apply, triggers only 149 and 151. So that's a clear answer from the state's highest court as to what applies. So there is certainly certainty on that point. The second SJC case that I point you to is the Jan Pro case. There they explain that control that is required by law, so if Prompt 2 were to apply, and that control were to be considered in some challenge relating to Prompts 1 and 3 of the same statute, cannot be imputed. And what that means, therefore, is that any control that expressmen would have to assert or cover over its employees couldn't be considered by a superior court in reviewing whether 1 and 3 apply. Can I ask what's happened in the aftermath of all of this litigation? Your Prompt 2 has a phrase in it, otherwise in the course of the employer's business. Has the legislature looked at this again? Has there been any effort by the Attorney General to bring Massachusetts more in line with the other states and not have that special provision? Your Honor, the legislature, as far as I'm aware of, has taken no final action on any of this. Has there been any suggestion from your office that perhaps it should? I'm not aware of any. And certainly these issues have not yet been definitively resolved by the court. So a substantially similar statute, which both this court and the Seventh Circuit consider, that's currently pending in the cert petition. And perhaps after all of these issues are resolved, that would be a time for the legislature to take action. Thank you. Thank you. Good morning. And may it please the Court, David Casey and with me Steve Melnick on behalf of the MDA. In light of my brother's concession, I must say I'm happy to answer questions, but I think this case was effectively resolved the last time we were here and it's been conclusively decided by the panel in the Schwann decision. But you would be taking the position even if Schwann had not been decided that you win? I would because our record is far more robust and the factual findings by the district court are far more compelling in demonstrating F-Quad A preemption. The effect on the MDA exemplar by virtue of the ban on the use of independent contractors is to double their labor costs and profoundly affect the availability of certain services and certain routes. So whereas Schwann was decided more or less on the face of the statute, we have demonstrated at great length without opposition by the Attorney General that the effect of the ban on the use of independent contractors is such that the exemplar would be driven out of business. Thank you. I just want to be clear, except for the bookkeeping type employees, all of the rest of your workers are independent contractors, including those who do regularly scheduled routes. That's correct, Your Honor. And those who do the on-demand pickup, the district court found that although there are about a dozen of these people who bid on the job, is it the same dozen every day? No. No. Okay, so the identity of those people may change from day to day. Correct. And only seven of them end up getting something like 20 hours a week worth of work. That is precisely the state of the record at the time that the record was made. I cannot vouch with certainty that the precise numbers apply as we talk about this today. But when the record was created, those were the numbers. And as for the other employees on the standard routes, do they have standard times and hours that they work? It depends upon the routes. It depends upon what route they bid on. Some routes take approximately four hours. Some routes take six to seven hours. And depending upon their availability, and many of these people work for multiple providers, depending upon their availability, what routes they bid on and what routes they get as a consequence of their bid, there may be continuity but there may not be. So there may have been a person who normally would handle a specific route, but if he gets underbid, he may lose that job and the lower-priced independent contractor would do it. No may about it. He would lose that job. Okay. So it's merely the bid, the price. Those are the only determinants? And availability to service that particular route. Okay. Thank you. Thank you.